## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 50374 | DATE | 8/17/2004 |
| CASE TITLE | | Harris vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to the Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | 8-17-04 date docketed | 18 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | | 8/17/2004 date mailed notice | |
| SP | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | SP mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| DWAYNE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50374 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Dwayne Harris ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB) pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on November 24, 2003. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### I. BACKGROUND

Plaintiff filed for DIB on June 17, 2002, alleging disability since April 15, 2001, due to epilepsy. (Tr. 73-75). Plaintiff's application for benefits was denied on October 16, 2002. (Tr. 43-45). On November 21, 2002, Plaintiff filed a request for reconsideration. (Tr. 47). Plaintiff's request for reconsideration was denied on December 23, 2002. (Tr. 48-51). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on February 21, 2003. (Tr. 52). Plaintiff appeared, with counsel, before an ALJ on June 3, 2003. (Tr. 23). In a decision dated June 23, 2003 the ALJ found that Plaintiff was not entitled to DIB. (Tr. 14-20). On June 26, 2003,

Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 9). On August 8, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7).

## II.     FACTS

Plaintiff was born on June 14, 1976. (Tr. 26). Plaintiff was twenty six years old at the time of his June 3, 2003 hearing before the ALJ. (*Id.*). Plaintiff is six feet and two inches tall and weighs 260 pounds. (Tr. 148). Plaintiff is a single male with one minor dependant daughter born out of wedlock. (Tr. 147). Plaintiff's daughter resides in Alabama. (*Id.*). At the time of the hearing Plaintiff was living with his mother and two younger teenaged siblings in Rockford, Illinois. (Tr. 27). Plaintiff is a high school graduate and received an associates degree in accounting from Rockford Business College in 1999. (Tr. 28).

Plaintiff claims he is unable to work due to epilepsy. (Tr. 73). Plaintiff has worked since his alleged onset of disability date of April 15, 2001. (Tr. 27). Plaintiff worked as an income tax assistant for a company called Professional Accounting & Tax Service, Inc., located in Rockford Illinois. (Tr. 28). Plaintiff described the job as seasonal, lasting from January to April. (Tr. 93). In 2003, Plaintiff only worked from January 6, 2003 to February 10, 2003, due to increase in frequency of his seizures. (Tr. 28). Plaintiff testified that he experienced seizures at work. (*Id.*). Kevin Greenberg, the tax office manager, provided a letter stating that he witnessed Plaintiff having a seizure at work. (*Id.*). Mr. Greenberg described one incident when Plaintiff, while working with a client, fell off his chair, appeared unconscious and unresponsive and had to receive emergency medical attention. (Tr.113). Mr. Greenberg did not specify a date in his letter on which this incident occurred. (*Id.*).

Plaintiff's work as an income tax assistant was sedentary, and involved sitting at a desk and

2

preparing income tax returns for eight hours a day. (Tr. 94). In the past, Plaintiff has worked as a customer service representative, waiter, cook, and in shipping and receiving. (Tr. 33). Plaintiff's job as a customer service representative was with a telemarketing firm. Plaintiff's telemarketing job was sedentary. (*Id.*). Plaintiff's work as a waiter involved walking and carrying dinner trays, weighing less than ten pounds, to customers. Plaintiff also has worked in shipping and receiving for a factory that made tools; the job involved placing boxes, usually weighing twenty five pounds, off and on trucks. (*Id.*).

Plaintiff has had seizures since 1989, when he was thirteen years old. (Tr. 121). During a typical seizure Plaintiff loses consciousness and is unresponsive for several minutes while his body tenses up and shakes; afterwards Plaintiff feels fatigued and usually he falls asleep for three to four hours. (Tr. 29-31, 35). Plaintiff testified that he usually has seizures at night when he is sleeping, and then wakes up feeling fatigued. (Tr. 30-31). Plaintiff also has seizures during the day, usually in the morning when he is getting ready for work or school. (Tr. 31). As a child Plaintiff was successfully treated with Dilantin and Depakote, and then Depakote mono-therapy. (Tr. 121). Plaintiff was found eligible as a child for SSI, and continued receiving disability benefits after his eighteen year old review. (Tr. 71).

Plaintiff's SSI was terminated in November 1998, (Tr. 88). For several years Plaintiff was off all medications. (Tr. 147). Plaintiff testified that he had a seizure-like episode three times per month when he was off all medication. (Tr. 35).[1] Plaintiff got his associates degree during this period and describes it as the best time of his life. (*Id.*).

---

[1] Although Plaintiff testified that during this period he suffered approximately three seizures a month, the medical record indicates otherwise. The medical record indicates that during this period Plaintiff experienced a seizure once every three months. (Tr.121).

3

In early 2001, Plaintiff experienced an increased frequency of seizures. (Tr. 121). Plaintiff sought treatment for his seizures. (Tr.142). At the time of the hearing, Plaintiff's recommended treatment regimen included 400 mg of Dilantin and 150 mg of Tegretol. (Tr. 28). Plaintiff testified at the hearing that he experiences about two or three seizures a week. (Tr.34).[2] Plaintiff testified that sometimes he has to miss work when he has a seizure in the morning or leave work after he has a seizure at work. (*Id.*). Plaintiff testified that the frequency of his seizures is not compatible with the toleration of absenteeism at any of the jobs he performed in the past or has the ability to perform. (*Id.*).

Christopher Yep, a vocational expert, testified at the ALJ hearing. (Tr. 36-39). Mr. Yep testified that he was familiar with Plaintiff's file, including a Residual Functional Capacity Assessment ("RFC"), which prohibited Plaintiff from climbing ropes, using ladders, working at unprotected heights, and to avoid working around dangerous machinery. (Tr. 36). Mr. Yep classified Plaintiff's past relevant work as an income tax assistant as a semi-skilled job performed at a sedentary level of exertion. (Tr. 37). Mr. Yep found Plaintiff's other past work as a customer service representative, waiter, and shipping and receiving to be unskilled work performed at sedentary, light and medium levels of exertion respectively. (*Id.*). Mr. Yep was asked by the ALJ whether a person of Plaintiff's age and education, who was unable to climb ropes, use ladders, work at unprotected heights, or around dangerous machinery could work as an income tax assistant. (*Id.*). Mr. Yep testified that such a person could work as an income tax assistant and that Plaintiff's limitations would not prevent Plaintiff from performing any of his past relevant work. (*Id.*). Mr.

---

[2]There is little testimony at the hearing describing Plaintiff's daily activities, or how Plaintiff's seizures affect his lifestyle.

4

Yep also testified that there were other jobs in the state of Illinois such as cashier and assembly positions which a person of Plaintiff's age, education and limitations could perform. (Tr. 39). Mr. Yep testified that the toleration of absenteeism at the jobs described above was that of one day per month, or twelve days per year. (Tr. 38).

The RFC from the ALJ is based on the ALJ's perceptions that: (1) the course of treatment pursued by Plaintiff's treating physicians is routine and conservative; (2) the medical record does not contain any statement by a treating physician stating that Plaintiff is disabled; (3) Plaintiff's complaints of disabling symptoms are not credible because they are inconsistent with the medical record; (4) the medical record indicates that oral anticonvulsant medications are effective in controlling Plaintiff's epilepsy and; (5) Plaintiff's epilepsy could be controlled if he complied with his prescribed treatment. (Tr. 17).

### III. **MEDICAL HISTORY**

On February 14, 2002, Plaintiff was admitted to Dr. Arthur Breck M.D. through the emergency department of an unidentified hospital after suffering several seizures. (Tr. 142). Plaintiff complained of having seizures. Plaintiff was referred for a neurological consultation. (*Id.*).

On February 15, 2002, Plaintiff saw Dr. Terry Roth of the Seizure Control Clinic of the Epilepsy Foundation of North/Central Illinois for his neurological consultation. (Tr. 142-143). Dr. Roth reviewed Plaintiff's medical history and stated that although Plaintiff went off all medication without seizures for a couple of years, Plaintiff would have to resume medication to combat the escalating frequency in seizures. (Tr. 142). Dr. Roth medicated Plaintiff with Dilantin and observed that at 400mg of Dilantin Plaintiff was maintaining at a therapeutic level of 10. (*Id.*).[3] Dr. Roth

---

[3]The therapeutic range for Dilantin is 10-20 UG/ML. (Tr. 117).

5

recommended treating Plaintiff's seizures with 200 mg of Dilantin twice a day. (*Id.*).

On June 24, 2002 Plaintiff was seen at the Crusader Clinic, in Rockford Illinois, for his recurring seizures. (Tr. 114). The Specimen Report on Plaintiff's blood showed a sub-therapeutic level of Dilantin at 4.4. (Tr. 117). Plaintiff's prescription for Dilantin was refilled by Dr. John Coffey. (Tr. 114).

On July 1, 2002, Plaintiff's mother, aunt and grandmother filled out seizure description forms for the Bureau of Disability Determination Services. (Tr. 102-104). All three of Plaintiff's relatives had witnessed the Plaintiff during a seizure and described Plaintiff as having seizures more than once per week. (*Id.*). According to Plaintiff's relatives, during a typical seizure, Plaintiff is unconscious for several minutes, while his body stiffens, his face distorts and he bites his tongue; immediately afterwards Plaintiff is fatigued and falls asleep. (*Id.*).

On August 8, 2002, Plaintiff was examined by Dr. Kamlesh Ramchandani at the request of the State Disability examiners. (Tr. 119-120). Dr. Ramchandani reported that Plaintiff claimed to have a seizure once every two weeks and usually at night. (Tr. 119). Dr. Ramchandani performed a physical exam on Plaintiff and found him to be in good health and in no physical distress. (*Id.*). Dr. Ramchandani noted that Plaintiff had a seizure disorder. (Tr. 120).

Plaintiff returned to the Crusader Clinic on September 12, 2002. Plaintiff's Dilantin level was at 4.4, which was substantially below therapeutic levels. (Tr. 117). On September 14, 2002 Plaintiff saw Dr. Roth again. (Tr. 121). Dr. Roth concluded that Plaintiff probably suffered from either a primary generalized seizure disorder or juvenile myoclonic epilepsy and recommended a follow-up EEG. (Tr. 122). Dr. Roth also stated that 300 mg of Dilantin per day was not therapeutic and that Plaintiff should be on a regimen of 400 mg of Dilantin per day. (*Id.*). Dr. Roth also

expressed that if Plaintiff's seizures were not controlled with Dilantin monotherapy he would recommend resuming Depakote. (*Id.*). On September 18, 2002, an EEG report was performed on Plaintiff. (Tr. 123). Dr. Roth stated that the results of the EEG revealed mild to moderately abnormal waking record with some epileptic significance. (*Id.*).

On September 24, 2002, Plaintiff was seen in the emergency room of Rockford Memorial Hospital by Dr. Jason Bredenkamp M.D. (Tr. 129). Plaintiff had a lacerated lip, and an abrasion on the right side of his face. (Tr. 130). Plaintiff received wound care and his tetanus was updated. (*Id.*). Plaintiff recounted to Dr. Bredenkamp that he awoke on a porch and assumed he had had a seizure. The laboratory results of Plaintiff's Dilantin level revealed a subtherapeutic level at 2.0. (Tr. 133). Plaintiff was advised to continue on his Dilantin and to follow-up with his neurologist. (Tr. 130).

On October 7, 2002 a state physician, Dr. William Conroy, reviewed Plaintiff's medical records and completed an RFC Assessment. (Tr. 134-41). Dr. Conroy concluded that Plaintiff did not have any exertional, visual, manipulative or communicative limitations. (Tr. 135, 136, 138). Plaintiff did however have certain postural and environmental limitations. (Tr. 136, 138). Dr. Conroy cautioned Plaintiff to never climb ladders, ropes or scaffolds, and avoid concentrated exposure to hazardous machinery and heights or situations where an unpredictable seizure would be dangerous. (Tr. 141).

On November 16, 2002, Plaintiff saw Dr. Roth for a follow-up appointment. (Tr. 124). Plaintiff described having seizures and acknowledged noncompliance with his treatment regimen. (*Id.*). Plaintiff underwent an EEG report and was reminded by Dr. Roth that he was supposed to be taking two 100 mg pills of Dilantin in the morning and two 100 mg pills of Dilantin at night for a

total daily dosage of 400 mg of Dilantin to control his seizures. (*Id.*). Dr. Roth reported that Plaintiff experiences seizures when he is not compliant with the prescribed treatment, and encouraged Plaintiff to be compliant. (*Id.*).

On January 30, 2003, Plaintiff underwent a CT scan of his brain. (Tr. 144). The admitting physician was Dr. Roth and the attending physician was Dr. Robert Escarza M.D. (*Id.*). Results of the CT scan showed a thickening of the diploic space of the skull, a known side effect of chronic anti-seizure medication. (*Id.*). Plaintiff's brain was normal in morphology, although there was a soft tissue injury to the left frontal region. (*Id.*).

On April 10, 2003, Plaintiff saw neurologist, Dr. Javaid Iqbal M.D., at his office for a neurological examination. (Tr. 147).[4] Plaintiff was accompanied to the evaluation by his mother, who told the doctor that Plaintiff had "starring spells" on a daily basis and about twice a week Plaintiff had a "generalized tonic-clonic" seizure. (*Id.*). Plaintiff told Dr. Iqbal that usually he did not have any warning before having a seizure. (*Id.*). Plaintiff told Dr. Iqbal that he had been taking 100mg of Dilantin twice a day (which was not the amount prescribed by Dr. Roth). Dr. Iqbal ordered a CT scan, EEG report and a check of Plaintiff's Dilantin level. (Tr. 146). Plaintiff's Dialntin level was subtherapeutic. (*Id.*). The CT scan was negative except for a thickened calvarium, which can result from chronic anti-seizure medication. (Tr. 153). Dr. Iqbal prescribed 300 mg of Dilantin per day and added 150 mg of Trileptal to Plaintiff's treatment regimen. (Tr. 146). Plaintiff was instructed by Dr. Iqbal not to drive a car or engage in activities where an unpredictable seizure would result in injury. (*Id.*). Dr. Iqbal stated that he hoped to control

---

[4]Dr. Roth requested Dr. Iqbal examine Plaintiff, possibly for another opinion on Plaintiff's ailment and treatment. (Tr. 147).

8

Plaintiff's seizures with a gradual increase in Trileptal. (*Id.*).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be

9

disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993), *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), cert. denied. "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.  FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[5] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment

---

[5]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[6] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process

---

[6]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

11

by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994); Social Security Law

and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

The Court will proceed through the five step analysis in order.

A. Step One: Is the Plaintiff currently engaged in substantial gainful activity?

At the hearing, Plaintiff testified that since April 15, 2001, the alleged onset of disability date, he had done some seasonal tax work for Professional Accounting & Tax Service Inc. (Tr. 28). The record disclosed posted earnings of $2,960.21 in 2001 and $207.75 in 2002. (Exhibit 2D pg 2) The ALJ did not determine from the facts whether this constituted work performed at a substantial gainful activity level or an unsuccessful attempt to work on Plaintiff's behalf. In performing the Step One Analysis the ALJ reserved a finding whether Plaintiff's work activity was disqualifying substantial gainful activity. (Tr. 15).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The ALJ did not deny Plaintiff's application for DIB based on the first step of the evaluation. (Tr. 15). The finding of the ALJ as to Step One of the Analysis is not challenged by either party and this Court finds no reason to disturb this finding. The ALJ's determination as to Step One of the

13

Analysis is affirmed.

B. Step Two: Does the Plaintiff suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from a severe impairment. Specifically, the ALJ found that Plaintiff suffered from epilepsy that significantly limited the Plaintiff's ability to perform basic work activities. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and this Court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.  Step Three: Does Plaintiff's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (*Id.*). The ALJ found that Plaintiff's epilepsy does not satisfy the criteria under 11.03, because it does not occur more frequently than once weekly, in spite of at least three months of prescribed treatment. (*Id.*). The ALJ did not find any evidence in the medical record to support a finding of seizures occurring at a disabling rate despite medical treatment. (Tr. 17). Additionally, the ALJ found the course of treatment pursued by Dr. Roth to be conservative and effective in controlling Plaintiff's seizures, provided Plaintiff complied with the treatment. (*Id.*).

Plaintiff testified at the hearing that he experiences about two or three seizures a week and his current treatment regimen includes 400 mg of Dilantin and 150 mg of Tegretol. (Tr. 34, 28). Plaintiff resumed medical treatment of his epilepsy as of February 2001. However the medical record contains evidence that Plaintiff is not complying with his prescribed treatment, and thus is

14

ineligible under 11.03.

The role of prescribed treatment in the evaluation of epilepsy is provided in SSR 87-6. SSR 87-6 requires that the Plaintiff: (1) have an ongoing relationship with a licensed physician or "Treatment source"; (2) have adequate information regarding the history of the treatment regimen and his response to it; (3) provide a record of anticonvulsant blood levels, and unless convincing evidence to the contrary is provided, low blood levels of anticonvulsants are presumed to be a result of noncompliance with treatment. The Seventh Circuit held that a plaintiff's medical record must contain evidence of a causal link between noncompliance and ongoing seizures, for the ALJ to render a decision that the plaintiff's epilepsy does not meet Listing 11.03. *Steele v. Barnhart*, 290 F.3d 936, 942-3, (7th Cir. 2002).

In the instant case Plaintiff has an ongoing relationship with Dr. Terry Roth M.D., and thus this Court regards Dr. Roth as the treatment source. Plaintiff has had seizures since 1989, when he was thirteen years old. (Tr. 121). As a child Plaintiff was successfully treated with Dilantin and Depakote, and then Depakote mono-therapy. (*Id.*). On February 15, 2002, Dr. Roth examined Plaintiff, and recommended that Plaintiff resume medication to combat the recent escalating frequency in seizures. (Tr. 142-143). Dr. Roth medicated Plaintiff with Dilantin and observed that at 400mg Plaintiff was maintaining at a therapeutic level of 10.0. (*Id.*). Dr. Roth recommended treating Plaintiff's seizures with 200 mg of Dilantin twice a day. (*Id.*). The medical record contains adequate evidence of Dr. Roth's attempts to control Plaintiff's current seizures with anticonvulsant therapy. (Tr. 122).

Plaintiff's counsel explained to the ALJ that due to lack of finances Plaintiff does not take his medication at the prescribed dosage and frequency. (Tr. 25). Plaintiff also stated that he does

15

not like the increased dosage of his medication because of side effects such as weight gain, sluggishness, and some intermittent jerky movements involving his arms and legs. (Tr. 147, 149).

The instant medical record contains evidence of a causal link between Plaintiff's noncompliance with his prescribed treatment and his ongoing seizures. On September 24, 2002, Plaintiff was seen in the emergency room of Rockford Memorial Hospital by Dr. Bredenkamp. (Tr. 129). Plaintiff recounted to Dr. Bredenkamp that he awoke on a porch and assumed he had had a seizure. The Plaintiff's record of anticonvulsant blood level was sub-therapeutic. (Tr. 133). On November 16, 2002, during a follow-up with Dr. Roth, Plaintiff described recent seizures and acknowledged noncompliance with his treatment. (Tr. 124). Dr. Roth advised Plaintiff to comply with his treatment since Plaintiff only experiences seizures when he does not take his medication, as prescribed. (*Id.*).

The instant medical record also contains numerous laboratory reports of Plaintiff's sub-therapeutic anticonvulsant blood levels. (Tr. 117, 124, 133). Plaintiff, his treating physician Dr. Roth and his counsel have all stated that Plaintiff was not complying with his prescribed treatment. Plaintiff has failed to rebut the presumption that his low anticonvulsant blood levels are due to noncompliance with his prescribed treatment. Although Plaintiff claims that the ALJ failed to properly analyze Plaintiff's claim under epilepsy impairment listing 11.03 and SSR 87-6, substantial evidence exists to support the ALJ's finding and this Court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.  Step Four: Is the Plaintiff capable of performing work which the claimant performed in the past?

The ALJ established Plaintiff's RFC as only precluding Plaintiff from employment which

16

entailed climbing ropes, ladders, scaffolds; or preforming work at or around unprotected heights or hazardous machinery. (Tr. 15). Plaintiff's relevant past work is that of an income tax assistant and telemarketer. (Tr. 18). At the hearing the ALJ asked the vocational expert if a hypothetical person, of Plaintiff's age, education and RFC limitations, could perform work as an income tax assistant or telemarketer. (Tr. 37). The vocational expert testified that given the aforementioned RFC, this individual could perform past work as an income tax assistant and telemarketer. (Tr. 37-38).

Although the ALJ concluded that the Plaintiff can perform his past work, there was evidence that these past jobs may not have been done at a substantial gainful activity level. (Tr. 18). In performing the analysis for Step Four, the ALJ reserved a finding on whether Plaintiff is able to perform his past relevant work. (Tr. 19). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and this Court finds no reason to disturb it. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.   Step Five: Is the Plaintiff capable of performing any work existing in substantial numbers in the national economy?

At Step Five the ALJ determined that Plaintiff's RFC allowed Plaintiff to perform a significant number of jobs in the national economy, such as that of a cashier and assembler. (Tr. 19). The ALJ took into account that the Plaintiff was twenty six years old and had a college degree. (Tr. 18). The ALJ found that the Plaintiff's past relevant work provided skills that were transferrable to other occupations within the Plaintiff's RFC. (*Id.*).

The vocational expert testified that the toleration of absenteeism at cashier and assembler jobs is that of one day per month, or twelve days per year. (Tr. 38). The Seventh Circuit has held that hypothetical questions posed to vocational experts must include all limitations supported by

medical evidence in the record. *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993).

Plaintiff claims that the toleration of absenteeism at cashier and assembly positions is not compatible with the frequency of his seizures. (Tr. 38). From the record this appears correct, but only correct because Plaintiff does not take his prescribed medications. During the step three analysis the Court determined that there was substantial evidence that Plaintiff's noncompliance with his prescribed treatment was a causal factor in the frequency of occurrence of Plaintiff's seizures. The Social Security Administration rules and regulations provide that, except in a certain explicit circumstances, individuals must follow prescribed treatment to attain benefits. 20 CFR § 404.1530 (2001). Plaintiff has failed to provide this Court with an acceptable reason for why he is not complying with his treatment. This Court finds that there is substantial evidence to support the ALJ's determination that Plaintiff's noncompliance with his prescribed treatment is causally linked to his absenteeism from employment; and if Plaintiff complies with his prescribed treatment, then he can perform work as a cashier or assembler. The ALJ's determination as to Step Five of the Analysis is affirmed. (Tr. 19).

## VII. CONCLUSION

For the reasons stated above, the ALJ's decision to deny benefits to the Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

**ENTER:**

_P. Michael Mahoney_
**P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT**

DATE: 8/17/04